UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FRANK BURNHAM,

      Plaintiff,

v.                                                      Case No:  2:15-cv-9-FtM-CM

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____

## OPINION AND ORDER

Plaintiff Frank Burnham seeks judicial review of the denial of his claim for Social Security disability benefits and supplemental security income by the Commissioner of the Social Security Administration ("Commissioner").

### I.    Issues on Appeal

Plaintiff raises two issues on appeal:[1] (1) whether substantial evidence supports the finding of Administrative Law Judge Christine Coughlin (the "ALJ") that Plaintiff's impairments did not meet or equal Listing 11.02 and (2) whether substantial evidence supports the ALJ's assessment of Plaintiff's Residual Functional Capacity ("RFC") with respect to his mental limitations.   Because the decision of the

---

[1] Any issue not raised by the Plaintiff on appeal is deemed to be waived. *Access Now, Inc. v. Southwest Airlines Co.,* 385 F.3d 1324, 1330 (11th Cir. 2004) ([A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."), *cited in Sanchez v. Comm'r of Soc. Sec.,* 507 F. App'x 855, 856 (11th Cir. 2013).

Commissioner is supported by substantial evidence and the Plaintiff has not shown any reversible error, the decision will be affirmed.

## II.   Background and Relevant Medical History

Plaintiff is a forty-five year old man, born in July 1969.   Tr. 209.   He possesses a sixth-grade level education, as he did not complete his seventh grade year (Tr. 240) and never pursued his GED.   Tr. 366.   Plaintiff has a history of suicide attempts and a troubled childhood, reporting that he had been physically and sexually abused as a child, and developed a history of drug and alcohol abuse as a result of his mother forcing him to use cocaine at the age of six.   Tr. 366.   In the past, Plaintiff has worked as a maintenance person, delivery driver, and kitchen helper.   Tr. 62-63, 241.   Plaintiff claims that his trouble with seizures became dramatically worse in 2000 when he fell out of a truck traveling at a high rate of speed and sustained a head injury.   Tr. 365.   Since that incident, Plaintiff has reported suffering from headaches before each seizure and worse headaches after each seizure.   *Id.*

### A. Summary of medical evidence – physical impairments

Plaintiff's first emergency room visit in the record was on September 16, 2005. Tr. 309.   Plaintiff complained that he was feeling light-headed and had a headache that felt, "like his prodrome to having a seizure."   *Id.*   Plaintiff reported a significant history of seizures and headaches and that he had been prescribed Tegretol for treatment, but he had not been taking this medication for the past year.   Tr. 309-10. During his physical examination by Dr. Carl Schultz, Plaintiff was given a liter of

fluid and Tegretol, after which he reported that he no longer felt like he was going to have a seizure.   Tr. 310.   Plaintiff was instructed to take Tegretol and referred to Dr. Duong of neurology.   *Id.*   Dr. Schultz, however, also instructed Plaintiff to return to the emergency room for any symptoms of seizures or increased headaches. *Id.*

The next record of Plaintiff seeking medical treatment for his seizures is more than two years later, on November 16, 2007, when Plaintiff was treated by Dr. Aldith Lewis, D.O., at the Family Health Centers of Southwest Florida.   Tr. 326.   Plaintiff reported that he had had a seizure the day before and that he had a history of seizures for the previous five years.   *Id.*   Dr. Lewis did not note any remarkable physical findings, but diagnosed Plaintiff with generalized convulsive grand mal epilepsy. *Id.* Dr. Lewis prescribed Dilantin and requested that Plaintiff follow up with the epilepsy foundation for neurology, and follow up with him again in three weeks.   Tr. 327.   On December 7, 2007, Plaintiff returned see Dr. Lewis; however on this occasion his chief complaint was of left arm and chest pain.   Tr. 323.   Plaintiff returned days later on December 10, 2007, again complaining of chest pain.   Tr. 320-21.   Dr. Lewis prescribed Naprosyn, Tramadol, and Prilosec and instructed Plaintiff to follow up in two weeks.   *Id.*   On December 20, 2007, Plaintiff followed up with Dr. Lewis, who recommended that Plaintiff seek education about regular exercise and a proper diet, as well as quit smoking.   Tr. 318.

Months later, Plaintiff again was taken to the emergency room on October 16, 2008 for a seizure.   Tr. 342.   Plaintiff had been arrested by the sheriffs and had a

seizure while he was waiting in the detainee room.   *Id.*   Plaintiff fell on the floor during the seizure, which lasted less than two minutes.   *Id.*   In the emergency room, Plaintiff denied having further symptoms such as double or blurry vision; light-headedness or dizziness; incontinence; cough, cold, congestion, fever or chills; headaches; or any other symptoms.   *Id.*   Plaintiff indicated that he was "supposed to be on Tegretol," taking 200 milligrams, twice daily, and that had been taking it for the past three days.   *Id.*   The emergency department evaluation noted that Plaintiff's white blood cell count was elevated at 15,000, which was consistent with seizure, and a complete metabolic profile showed his Tegretol levels were low.   *Id.* Dr. Carrie S. Dunn, M.D., conferred with Dr. Bonnette who was on call for neurology, and prescribed 400 milligrams of Tegretol to be taken by mouth at the emergency room, as well as an increased dose of 400 milligrams of Tegretol to be taken twice daily going forward.   Tr. 342-43.   She also instructed Plaintiff on how to take his medications and recommended that Plaintiff have his Tegretol levels checked in seven to ten days by Dr. Berdick or himself.   Tr. 343.

Plaintiff's next reported incident of seizure was on July 6, 2009 when he sought emergency room treatment for left testicular pain.   Tr. 340.   Plaintiff stated that he had suffered from a seizure four days earlier, and since that seizure he was experiencing pain in his left groin and left testicle.   *Id.*   Plaintiff denied having any chest pain or shortness of breath; no dysuria, hematuria, neck pain, fever or chills; no easy bleeding or bruising; and no palpitations.   *Id.*   Jeffrey G. Laoange, M.D., performed a testicular ultrasound which came out negative and found no hernia.   *Id.*

Plaintiff was given sixty milligrams of intramuscular Toradol and noted improvement afterwards.  *Id.*  Plaintiff was discharged and told to follow up with Dr. Bretton if his groin pain continued.  Tr. 341.  Later that month, on July 20, 2009, Plaintiff visited his primary care physician, Kenneth A. Berdick, M.D.  Tr. 351.  Plaintiff's wife, Nancy Burnham, reported that her husband had been having "breakthrough seizures" at night, but the seizures were not "tonic-clonic[2] in nature."  *Id.*  She further stated that during the seizures Plaintiff "just stares at her," cannot hear her, and that he is "not aware" that the episodes are occurring.  *Id.*  Dr. Berdick directed Plaintiff to take 500 milligrams of Keppra twice a day and return to him in six months, but to call him if the seizures continued.  *Id.*

On September 11, 2009, Plaintiff visited the emergency room complaining of an allergic reaction.  Tr. 337.  Plaintiff had been cutting grass when he ran into a bees' nest and was stung approximately twenty times.  *Id.*  Plaintiff reported his past history of head injury, but made no mention of his seizures or epilepsy.  *Id.*  The treating physician, Henry Zimmerman, Jr., M.D., gave Plaintiff DuoNeb to improve his breathing and discharged him with an EpiPen, noting that his wheezing had improved.  *Id.*

---

[2] A tonic-clonic seizure, formerly known as a grand mal seizure, is a convulsive seizure in which, in the tonic phase, the individual loses consciousness and falls to the floor; and in the clonic phase the arms and usually the legs begin to jerk rapidly and rhythmically, bending and relaxing at the elbows, hips, and knees. After a few minutes, the jerking slows and stops. Bladder or bowel control sometimes is lost as the body relaxes. Consciousness returns slowly, and the person may be drowsy, confused, agitated, or depressed. These seizures generally last 1 to 3 minutes. http://www.epilepsy.com/learn/types-seizures/tonic-clonic-seizures.

Plaintiff returned to Dr. Berdick on November 9, 2009 complaining of urinary tract symptoms, but reported that the previously prescribed Keppra had controlled his seizures.   Tr. 350.   Dr. Berdick's assessment was that Plaintiff's epilepsy was controlled at this point, and he directed Plaintiff to continue taking Tegretol and Keppra as well as to start taking four milligrams of Cardura once daily.   *Id.*   One month later, on December 7, 2009, Plaintiff reported back to Dr. Berdick, stating that he was feeling better as to his prostrate issues and he was not experiencing any recurring seizures. *Id.*   Dr. Berdick diagnosed Plaintiff with cervicalgia, controlled epilepsy, and probable BPH without prostatitis.   *Id.*   Plaintiff was given cervical spine trigger point injections of Prednisone and directed to continue taking the Tegretol, Keppra, and Cardura.   *Id.*

Plaintiff's next visit to Dr. Berdick was on April 7, 2010, during which Dr. Berdick notated that the cervical spine trigger point injections previously given to Plaintiff resolved his problems significantly.   Tr. 348.    Dr. Berdick also noted that Plaintiff's epilepsy was controlled with the Tegretol/Keppra regimen and that he was feeling well overall.    *Id.*   Dr. Berdick directed Plaintiff to continue with the prescribed medications and return in three months for re-evaluation.   Tr. 348. Later that month, however, on April 17, 2010, Plaintiff visited the emergency room with symptoms of nausea, vomiting, and diarrhea that had persisted for the past three days.   Tr. 335.   Plaintiff stated that the symptoms began just after his latest seizure two days earlier and that during this seizure he hit the back of his head.   *Id.* As for medications, Plaintiff reported that he had maintained his use of Tegretol and

Keppra, as well as naproxen for his headaches.   *Id.*   Plaintiff was diagnosed with a seizure disorder, vomiting, and diarrhea; however, the treating physician, Douglas S. Lee, M.D., found that the gastrointestinal symptoms were unrelated to Plaintiff's history of seizures.   Tr. 336.   Upon discharge, Plaintiff's condition was noted as "improved," and Dr. Lee directed Plaintiff to discontinue using naproxen and switch to Tylenol to treat his headaches.   *Id.*   Dr. Lee also told Plaintiff to follow up with his primary care physician, Dr. Berdick. *Id.*   Days later, on April 21, 2010, Plaintiff sought emergency room treatment again, complaining of rectal bleeding and abdominal pain. Tr. 330, 358.   The treating physician, Aaron A. Wohl, M.D., informed Plaintiff that there was no need for any further diagnostic studies and that his current situation was not an emergency.   Tr. 331, 359.   Dr. Wohl noted that Plaintiff had been to the emergency room just four days earlier and that although Plaintiff complained of possible seizures, he demonstrated no shortness of breath or difficulty breathing.   Tr. 358.

Plaintiff did not report another seizure or any other medical incident until he visited with Dr. Berdick on January 24, 2011.   Tr. 346.   On this occasion, Dr. Berdick noted that Plaintiff was doing "very well" until the day before when he experienced what Dr. Berdick believed to be a tonic-clonic seizure, with a possible post-ictal state.   *Id.*   Plaintiff reported that he had not had a seizure for over a year and was taking all his medications.   *Id.*   Plaintiff's wife observed the seizure and reported that it lasted five minutes.   *Id.*   Plaintiff said he felt "tired" for about an hour afterwards.   *Id.*   Plaintiff also complained of right paracervical pain secondary

to his seizure.   *Id.*   Dr. Berdick administered a Xylocaine/Prednisolone intrasynovial/trigger point injection, after which Plaintiff felt immediate relief.   *Id.* Dr. Berdick also increased Plaintiff's prescription of Keppra to 750 milligrams and recommended Tylenol for recurring pain.   *Id.*   Due to the "hiatus" since Plaintiff's last seizure, Dr. Berdick ordered an MRI without contrast of the brain and requested that Plaintiff return in one month.   *Id.*   On February 8, 2011, Plaintiff had an MRI of his brain performed with and without contrast.   Tr. 354, 363.   The impression showed nonspecific white matter lesion suggesting vasculitis or a vasoocclusive phenomenon; however, the MRI otherwise was unremarkable.   Tr. 352-54.

Plaintiff's medical records also include a letter dated April 21, 2011, written by Devota Nowland, D.O., a retired osteopathic physician and surgeon from Michigan. Tr. 388.   In the letter, Dr. Nowland explains that she has consulted with certain patients on a pro-bono basis while spending the winter season in North Fort Myers. *Id.*   The letter continues that Plaintiff requested Dr. Nowland to review "medical records from Dr. Burdick [sic]" and provide comments.   *Id.* at 389.   Dr. Nowland commented that Plaintiff had suffered non-stop seizures at times, he had lost a considerable amount of weight, and the left side of his body had been "particularly affected."   *Id.*   Dr. Nowland opined that in February of 2009, although Plaintiff's pain may have been temporarily relieved due to the injections, "in no way did any treatment improve Frank's ability to function for any consistent length of time."   Tr. 389.   Dr. Nowland also noted that on April 21, 2010, Dr. Berdick stated that Plaintiff's epilepsy was controlled, but that Plaintiff continued to have frequent

seizures.   *Id.*   Further, she noted that despite her personal observations of Plaintiff's past seizures, Dr. Berdick reported that Plaintiff had not experienced a seizure for over one year.   *Id.*   Dr. Nowland acknowledged that her relationship with Plaintiff was not a traditional treatment relationship, and the observations included in her letter were not supported by any objective evidence.   *Id.*

Plaintiff did not visit the emergency room or seek any other medical care until May 6, 2011, when he visited Marcia K. Gilkes, an advanced registered nurse practitioner (ARNP) for a new patient check-up and medication refill.   Tr. 390. Plaintiff complained of seizures and headaches at this time, and reported that he was experiencing seizures mostly every month even though he was taking Tegretol and Keppra.   *Id.*   He also reported left side weakness and problems walking.   *Id.*   Ms. Gilkes' physical examination noted that the strength of Plaintiff's upper left extremity was reduced and his gait and stance were "abnormal."   Tr. 391.   Ms. Gilkes' assessment was that Plaintiff suffered from headache syndrome, generalized convulsive grand mal epilepsy, and disturbance of gait.   Tr. 398.   Ms. Gilkes prescribed the same 750 milligrams of Keppra and 400 milligrams of Tegretol and also instructed Plaintiff to stop smoking and consult with a physical therapist and neurologist before his follow-up appointment in two months.   Tr. 391.   Plaintiff followed up with the physical therapy sessions, which he attended from May 23, 2011 to September 12, 2011.   Tr. 572.

On June 3, 2011, Plaintiff had a neurological consultation with Nasir Khalidi, M.D.   Tr. 441.   Prior to the examination, Plaintiff underwent a second MRI showing

stable but nonspecific white matter abnormalities as compared to his previous MRI from February 8, 2011. *Id.* Plaintiff returned to see Dr. Khalidi on June 9, 2011, and reported that he had not suffered a seizure since May 20, 2011. Tr. 438. Later that month, on June 21, 2011, Plaintiff visited neurologist Eshan M. Kibria, M.S., M.B.A., D.O., an independent medical examiner for Social Security Disability. Tr. 421. Plaintiff complained of epilepsy and reported that he was experiencing seizures twice per month. *Id.* Plaintiff reported a history of epilepsy since his motor vehicle accident in 2000, as well as daily headaches and trouble with memory, noting that he had difficulty remembering doctors' appointments. Tr. 422. No advice or treatment was offered, and Plaintiff was asked to continue following the plan of his current treating physician. Tr. 421.

Plaintiff had a follow-up consultation with Dr. Khalidi on June 23, 2011 and reported that he had had a brief tonic-clonic seizure three days earlier on June 20. Tr. 435. Plaintiff said he was out in the sun, but reported no pre-ictus phenomenon, no tongue biting and no urinary incontinence. *Id.* Plaintiff insisted that he was taking medications on a regular basis and continued to use crutches to walk due to pain in his left leg and hip. *Id.* Dr. Khalidi recommended that Plaintiff increase his 750 milligram dosage of Keppra and return in four weeks to review Keppra and Tegretol levels. Tr. 437. Plaintiff saw Dr. Khalidi once more on July 21, 2011 for a follow-up visit. Tr. 430. Plaintiff reported that he felt dizzy and lightheaded and that he had had a seizure. *Id.* According to Plaintiff, he was stooping over while trying to fix a toilet bowl, and as he stood up he felt dizzy and fell. *Id.* There was

no tonic-clonic movement in the arms or legs, nor was there urinary incontinence. *Id.* Plaintiff further reported headaches on the top of his head and the frontal region and was seeking narcotic medication for his head pain. *Id.* Dr. Khalidi's notes state that an electroencephalogram on June 2, 2011 indicated left temporal epileptogentic activity recorded. *Id.* Dr. Khalidi's clinical impression was the Plaintiff suffered from cephalgia and seizure disorder. Tr. 432. Dr. Khalidi recommended Plaintiff maintain his current dosage of Keppra and Tegretol and see a pain management consultant for cervical block causing his head and neck pain. *Id.*

Throughout 2012 Plaintiff returned to Family Health Center of Southwest Florida for continued medication management for his seizure disorder. Tr. 487. These examinations made only generalized references to Plaintiff's seizure disorder with regard to the medications he was taking. Tr. 487-511. Plaintiff saw Colette S. Haywood, M.D. in December 2011 and March 2012. Tr. 504-11. On December 7, 2011, Plaintiff reported having his last seizure three days earlier; however, his chief complaint at this time was a medication refill and epilepsy follow-up. Tr. 507. Plaintiff also reported a history of epilepsy and his current list of medications consisting of Keppra and Tegretol. *Id.* Dr. Haywood maintained this medication regimen and added Ibuprofen to help deal with the headaches. Tr. 510. Plaintiff followed up with Dr. Haywood several times during the month of March for general medication refills; however, no specific instances of seizures were reported. Tr. 504-06.

Later in 2012, Plaintiff met with Donita I. Dobson, D.O., to refill his seizure

medications.  *See* Tr. 492-503.   Plaintiff met with Dr. Dobson on July 12, 2012 (Tr. 501), August 17, 2012 (Tr. 498), September 12, 2012 (Tr. 495), and October 10, 2012 (Tr. 492).   On each of these occasions, Plaintiff's chief complaints were dizziness, headache and seizure disorder.   Tr. 492, 495, 498, 501.   Plaintiff listed active problems as benign prostatic hypertrophy, epilepsy, and seizure disorder generalized convulsive grand mal.   *Id.*   Additionally, Plaintiff reported on each of these visits that he regularly was taking his seizure medications.   *Id.*   Notably, on Plaintiff's August 17, 2012 visit, he reported that he had a seizure the afternoon before his visit and fell over his chair, which caused him lower back pain.   *Id.*   Dr. Dobson sent Plaintiff to the hospital for further evaluation and x-rays of his thoracic and lumbar spine, which ultimately turned out to be negative for any acute fracture.   Tr. 557-58. Plaintiff was given Vicodin, which decreased his pain, and he was diagnosed with lumbosacral strain and left hip pain.   *Id.*

Plaintiff's final visit to Dr. Dobson took place on January 9, 2013 for a medication refill; no specific instances of seizure were reported.   Tr. 488.   Dr. Dobson continued Plaintiff on his current list of seizure medications.   *Id.*   On April 8, 2013, Plaintiff visited the Lee Memorial Hospital to seek treatment for back pain. Tr. 561.   Plaintiff reported that he was falling frequently and that his pain was worse than normal on this occasion.   *Id.*   He reported also that he suffered from a seizure disorder and at that time was having about eight seizures per week.   *Id.*   X-rays of Plaintiff's pelvis and the lumbosacral spine showed no fractures and appeared to be in very good repair.   *Id.*   Plaintiff was diagnosed with seizure disorder, fall, low back

pain, lumbosacral strain, and muscle spasms.   Tr. 561-62.   He was discharged in satisfactory condition.   Tr. 562.

### B.  Summary of mental/psychological evidence

With respect to Plaintiff's mental limitations, there is somewhat limited evidence in the record, as noted by the ALJ.  Tr. 25.  Plaintiff visited Mary Ann Elder, a Licensed Clinical Social Worker (LCSW) and Certified Addiction Counselor, on March 8, 2011 to undergo a biopsychosocial assessment interview.   Tr. 365.  Plaintiff was referred to Ms. Elder by his friend Priscilla Spear because he was "depressed about his medical, financial, and family situation."   Tr. 365.   All of the information included in Ms. Elder's report was provided by Plaintiff himself and collateral data from Ms. Spear.   *Id.*   Ms. Elder noted that Plaintiff was polite and cooperative, arriving on time and looking well groomed.   Tr. 365.   Plaintiff described his principal problem as daily episodes of seizures followed by severe migraines, for which medication has been ineffective.   *Id.*   The seizures and headaches began around 2001, and had gotten worse as they continued.   *Id.*  Plaintiff also said that his depression got worse when he lost his job because he felt that his "manhood was being threatened," especially since he was not approved for disability when he applied in 2007 and his wife was the sole source of income for the family.   *Id.*   Plaintiff further provided that he and his wife Nancy "argue a lot" because of the financial situation.   *Id.*

Plaintiff also discussed his family situation, mostly focusing on his childhood years.   Tr. 366.   Plaintiff discussed that his family life had impacted his mental

health as well, as he said he has been depressed most of his life.   Tr. 366.   He told

Ms. Elder he also had been diagnosed as a paranoid schizophrenic while in jail

because he got into several fights.   *Id.*   Plaintiff had thoughts of suicide while he

was in jail and made several attempts to end his life in 1984, 1992, 1995, and 1996.

*Id.*   Plaintiff also reported a long history of substance, nicotine and alcohol abuse.

Tr. 367.   Plaintiff told Ms. Elder he was able to "straighten out" his life when his

daughter was born in 1997.   Tr. 376.   As for hobbies and employment, Plaintiff

stated that he is a fabricator and inventor and has been "a tinkerer" his whole life.

Tr. 367.   He has worked since the age of eleven doing yard work and maintenance

because he is good with is hands and can "fix almost anything."   *Id.*   Although

Plaintiff does not have his GED, he obtained a small engine certificate from VoTech

at age seventeen and is a registered inventor with Inventech.   Tr. 366-67.   Due to

his medical problems with headaches and seizures, Plaintiff says it has been

"impossible" for him to think clearly, and since he has lost strength in the left side of

his body he no longer has the stamina to clean or do maintenance work.   Tr. 367.

Ms. Elder's diagnostic summary stated that Plaintiff seemed to be alert and

oriented to person, place, time and situation.   Tr. 368.   As for his mental history,

Ms. Elder found that Plaintiff had suffered under "severe childhood abuse and

neglect, foster care, homelessness, impulse control, legal problems, and substance

dependence," but that Plaintiff had turned his life around since the birth of his

daughter.   *Id.*   She further noted Plaintiff also has a healthy marriage, although it

is somewhat strained due to financial difficulties.   *Id.*   Although Plaintiff was

gainfully employed for several years, she reported he lost two jobs because of his seizure disorder and was very concerned that he would become homeless again. *Id.* Although Plaintiff received encouragement from Ms. Spear and was going to church regularly, Ms. Elder noted that Plaintiff still "appears depressed due to his decline in health, marital stress, and inability to work," as well as his sleep problems and "post acute stress disorder." Tr. 369. At the conclusion of the interview, Ms. Elder recommended that Plaintiff seek counseling for depression, and also referred Plaintiff to a psychiatrist and a cardiovascular and neurological specialist for evaluation. *Id.* Ms. Elder also administered "Beck's Depression Inventory," which is a self-scored test to determine the various levels of depression. *Id.* On March 8, 2011, Plaintiff completed this test and reported a score of 51.5, indicating "extreme depression." Tr. 379-80. Ms. Elder's progress notes indicate that after Plaintiff's initial assessment on March 8, 2011, he returned to see her on March 15, 2011, accompanied by Ms. Spear. Tr. 371. Plaintiff again completed the Beck's Depression Inventory, which totaled a score of 42.5, indicating "extreme depression" once again. Tr. 382-84. On March 22, 2011, Plaintiff followed up with Ms. Elder and was again accompanied by Ms. Spear. *Id.* Plaintiff reported that things were "up and down" with his wife, and that he continued to worry about his income. *Id.* Ms. Elder noted that Plaintiff's physical and mental problems have continued and that he is still severely depressed. *Id.* On this occasion, Plaintiff again completed a Beck's Depression Inventory and scored 41.5, which again amounted to "extreme depression." Tr. 385-87. Although two more appointments were scheduled for March 29, 2011 and April 7, 2011,

Plaintiff cancelled these appointments.   Tr. 371.

A few months later on May 18, 2011, the Office of Disability Determination requested that Plaintiff be interviewed by J.L. Bernard, J.D., Ph.D., and Deborah L O'Laughlin, Ph.D., of O'Laughlin-Bernard Associates, to determine Plaintiff's current level of disability.   Tr. 415.   Plaintiff alleged that he suffered from "epilepsy, memory loss, cardiovascular condition, depression, migraines, [and] brain abnormality."   *Id.*   Mrs. Burnham was the primary source of information on this occasion; however, other sources included Plaintiff himself and Ms. Elder's March 8, 2011 report.   Tr. 416.   Plaintiff's primary concerns were severe migraine headaches, marital stress, recent memory loss, and inability to recall and utilize rote skills.   *Id.* Plaintiff provided that his conditions have worsened over time, particularly depression, anxiety, obsessive thinking, suicidal behavior, and an inability to focus his attention.   *Id.*   In terms of his declining memory function, Plaintiff stated he had trouble recalling things that happened as recently as twenty minutes ago, and this had been noticed not only by himself, but by others as well.   *Id.*   As for Plaintiff's work history, he reported to Dr. Bernard that he had been unable to return to work because of his diminished physical strength and cognitive clarity.   *Id.*   He is also stated he is at risk of seizure throughout the day.   *Id.*   In the past Plaintiff had been treated for a number of conditions arising out of his former drug use.   *Id.*   Due to several attempts at suicide, Plaintiff was treated at the David Lawrence Center.   *Id.* Plaintiff reported he also suffered from health problems after being confined in the county jail, where he states he was diagnosed with paranoid schizophrenia; however,

Plaintiff never received any treatment for this condition and there is no other record of this diagnosis.   Tr. 417.

Dr. Bernard reported that Plaintiff appeared to be awake, alert and responsive, though his fine and gross motor skills were impaired.   *Id.*   He also noted that Plaintiff's mood was stable and his affect was depressed but his thought processes suggested no psychosis or perceptual anomalies.   Tr. 418-19.   Dr. Bernard opined that Plaintiff was "reasonably well oriented in all spheres," and that his "[m]emory registry was intact, while brief recall was somewhat impaired. . . ."   Tr. 419.   He further reported that Plaintiff's brief task was intact; he was able to retain, execute and sequence a multilayered task; and his judgment appeared to be within normal limits.   *Id.*   Plaintiff also was assessed on the "Folstein Mini-Mental State Exam," and scored twenty-nine out of thirty, which Dr. Bernard considered well within normal limits for Plaintiff's age and education.   *Id.*   Additionally, he was given a brief screening assessment known as a "Clock Drawing Test," on which Plaintiff again performed well.   *Id.*   Despite these favorable scores on the screening devices, Dr. Bernard noted that Plaintiff was having difficulty with cognitive function, which he found was illustrated by "daily functioning," such as not being able to recall if he had eaten twenty minutes after a meal, and Plaintiff's inability to "recall aspects of his history or core knowledge."   *Id.*   Although Plaintiff had been involved in building engines in the past, he reported being unable to recall how to fix a simple problem, and in his own words, "it's like it's [sic] all gone and never happened – I can't do it anymore."   *Id.*   Dr. Bernard concluded that Plaintiff's "cognitive integrity is in

question," and he recommended Plaintiff undergo a neuropsychological battery.   Tr. 420.

On May 26, 2011, Plaintiff was evaluated by Thomas Conger, Ph.D., who performed a psychiatric review technique ("PRT") for Plaintiff's disability determination.   Tr. 79.   Dr. Conger noted that while Plaintiff was limited by his physical condition and pain, he demonstrated the mental ability to perform routine activities such as fixing a sandwich or making a bed, if necessary.   *Id.*   He assessed Plaintiff's difficulties in maintaining concentration, persistence or pace as moderate.   Tr. 78-79.   Dr. Conger further noted that although Plaintiff alleged cognitive difficulties relating to the motor vehicle accident in 2000, he had a successful history of employment subsequent to the incident.   Tr. 79.   Further, Plaintiff's allegations regarding his severe memory difficulties were found by Dr. Conger not to be fully credible as they were inconsistent with Plaintiff's presentation and performance during his recent mental consultative examination.   *Id.*   According to Dr. Conger, although Plaintiff "may experience some memory problems at times, he remains functional from a mental perspective."   *Id.*   Dr. Conger characterized Plaintiff's statements regarding his symptoms as "partially credible," explaining that Plaintiff's "allegation regarding his memory deficits is not supported by the results of more objective evidence."   Tr. 81.

Dr. Conger also evaluated Plaintiff's mental residual functional capacity.   Tr. 83-85.   In rating Plaintiff's individual understanding and memory limitations, Dr. Conger noted that Plaintiff's ability to remember locations and work-like procedures

was "not significantly limited," nor was his ability to understand and remember very short and simple instructions." Tr. 83. In his assessment, Dr. Conger only noted that Plaintiff's ability to understand and remember detailed instructions was "moderately limited." *Id.* More specifically, Dr. Conger stated that although Plaintiff's condition "may result in some memory problems at times," he believed Plaintiff showed the "ability to perform routine tasks on a sustained basis, if motivated," and did not have any sustained concentration or persistence limitations. Tr. 83-84.

Finally, Plaintiff was evaluated by Aroon Suansillppongse, M.D. on June 25, 2012, who also completed a PRT and mental RFC. Tr. 457-70. In the "Rating of Functional Limitations" in the PRT, Dr. Suansillppongse reported that Plaintiff had a moderate degree of limitation in the categories listed as "Difficulties in Maintaining Concentration, Persistence, or Pace" and "Difficulties in Maintaining Social Functioning." Tr. 465. Dr. Suansillppongse noted, however, that the bulk of medical evidence was related to Plaintiff's physical impairments and treatment, and that the aforementioned social avoidance was primarily related to his physical ailments. Tr. 467. Dr. Suansillppongse further reported that Plaintiff's mental condition is "self-limiting or improved with appropriate treatment and sobriety," and, significantly, he provided that "[t]here is no evidence of significant thought disorder or cognitive deficits" because the MMSE score from May 18, 2011 was "29/30." *Id.* Similar to Dr. Conger's evaluation, in evaluating Plaintiff's ability to carry out detailed instructions and his ability to maintain attention and concentration for an

extended period, Dr. Suansillppongse likewise found Plaintiff only was "moderately limited" in those capacities.   Tr. 468.   Dr. Suansillppongse also found that Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods again was "moderately limited."   Tr. 469.   In his final assessment, Dr. Suansillppongse noted that Plaintiff is able to understand, remember, and carry out simple instructions.   Tr. 470.   Additionally, while Dr. Suansillppongse found that while Plaintiff's anxiety, depressive reaction, and pain/headaches would likely interfere with his ability for sustained concentration and persistence or task completion, he believed Plaintiff would be able to complete on-the-job tasks at an acceptable pace.   *Id.*

   C.   *Other evidence.*

   In addition to the medical evidence, the record contains several calendar entries created by Plaintiff and his wife to keep track of his seizures.   Tr. 545-553. These monthly calendars attempt to characterize the nature of the seizure activity, or other physical ailments on a particular day.   The calendars begin in July 2012 and continue through September 2012, then the calendars start up once again in January 2013 and continue through June 2013.   Tr. 545-553.

   As noted, in July 2012 Plaintiff was under the care of Dr. Donita Dobson.   *See* Tr. 501 and discussion, *supra*.   According to his calendar, during July 2012 Plaintiff suffered from a small "PM seizure" on July 8, a "seizure outside" on July 9 and a "bad day" on July 10, before seeing Dr. Dobson on July 12, 2012 to refill his medications.

The July 12 appointment, however, is not reflected on Plaintiff's calendar.   *See* Tr.

545.   Following this appointment, Plaintiff reported on his calendar that he suffered

from one "very bad" seizure characterized by Plaintiff as "GM," presumably meaning

Grand Mal, on July 23, one "small PM" seizure on July 25, two "small seizures" and

one "GM" on July 27, and two seizures on July 19.   *Id.*   The following month, on

August 17, 2012, Plaintiff again visited Dr. Dobson for a prescription refill; however,

on this occasion he also reported to her that he had an afternoon seizure on August

16 that caused him to fall over a chair and hurt his back.   Tr. 498.   On Plaintiff's

personal calendar, however, he reported many other seizures during this month,

which he did not report to Dr. Dobson.   Tr. 546.   In particular, Plaintiff reported

that he suffered from a "bad seizure" on August 7, a "seizure out in [the] yard with

telephone repair man," on the following day, a "bad seizure" on August 11, seizures

before and during church on August 12, and heatstroke with a seizure while Plaintiff

was in his yard on August 15.   *Id.*   Only Plaintiff's seizure on August 16 seemed to

be reported to Dr. Dobson because of the back pain he was experiencing at this time,

which prompted Dr. Dobson to order an x-ray of Plaintiff's back.   Tr. 557-58.   No

other seizures were reported to Plaintiff's medical providers during the remainder of

August 2012.   Tr. 546.   Plaintiff's calendar for September 2012 was sparsely

populated: He reported seizures all day on September 4 and a small seizure on

September 7.   Tr. 547. Plaintiff's medical records show he visited Dr. Dobson on

September 12, but he failed to report to her any specific instances of seizure earlier

in the month.   Tr. 495.   Instead, the chief purpose of his appointment was to refill

Plaintiff's current prescriptions of Keppra and Tegretol.   *Id.*   There are no calendars in the record the months of October, November or December 2012.

Plaintiff began his seizure log once again in January 2013, which also was the last occasion Plaintiff visited Dr. Dobson for a medication refill.   Tr. 488, 548. During Plaintiff's appointment on January 9, 2013, he did not report any specific instances of seizures; however, on his calendar he notated that he suffered seizures on January 2 and 3, 2013.   Tr. 548.   Plaintiff did not visit a doctor during the months of February and March 2013; however, in his calendars for the same period, he listed having three seizures on February 18, a "bad seizure" on February 27, and a seizure on March 29.   Tr. 549-50.   In April, however, Plaintiff visited the emergency room at Lee Memorial Hospital in order to seek treatment for back pain. Tr. 561.   In his calendar for the month of April 2013, Plaintiff reported having a seizure that caused him to fall and hurt his back on April 3 (Tr. 551); however, he did not mention this during his hospital visit on April 8, 2013, but instead reported that he "has about eight seizures a week."   Tr. 561.   In May 2013, Plaintiff notated seizures on May 6, 11, 12, 13, 19, 23 and 28.   Tr. 552.   On his June 2013 calendar, Plaintiff reported seizures on June 3, 5 and 9.   Tr. 553.

## III.   Administrative proceedings

In March 2011, Plaintiff applied for a period of disability, disability insurance benefits and supplemental security income.   Tr. 15, 209, 216.   He alleged that his epilepsy, memory loss, cardiovascular issues (the right side of his brain was "shutting down"), depression and migraines had rendered him unable to work as of October 15,

2007.   Tr. 216, 239, 233.   Plaintiff's application was denied initially and upon reconsideration.   Tr. 103-04, 133-34.   Plaintiff requested a hearing, and on June 12, 2013, an ALJ heard his case.   Plaintiff was represented by counsel.   Tr. 35-72. Plaintiff and a vocational expert testified at the hearing.   *Id.*

Plaintiff testified telephonically from Fort Myers, Florida to Administrative Law Judge Christine Coughlin in Falls Church, Virginia.   Tr. 37.   Plaintiff was forty-three years old at the time of the hearing, living in Fort Myers with his wife and his sixteen year old daughter.   Tr. 43.   The last time Plaintiff recalled working was in 2007, in maintenance for a resort, performing various repair jobs in order to prepare the hotel units for new guests.   Tr. 44-45.   Although Plaintiff was not certain, he thought that during the course of this employment he would lift or carry twenty or thirty pounds, the heaviest item being a microwave.   Tr. 46.   Plaintiff worked in maintenance for several years; however, prior to working as a handyman, he worked in a bike shop, where he would lift and carry anywhere from twenty to thirty pounds and would also have to operate a vehicle in order to deliver bicycles to customers.   Tr. 44-45.   Prior to working in the bike shop, in 2001 and 2002 Plaintiff worked for Miami Connections, where he cooked bagels during the evening and delivered them to hospitals.   Tr. 46-47.   Here too, Plaintiff estimated he lifted twenty to thirty pounds.   Tr. 47.

Plaintiff testified that he filed a claim for disability primarily due to his seizure condition, from which he has suffered since 2000 or 2001.   Tr. 47-48.   In terms of treatment, Plaintiff testified he regularly sees his primary care physician and takes

his prescribed medications, which include Tegretol and Keppra.   Tr. 48.   Plaintiff stated he also takes Ibuprofen for his headaches, Flexeril for his muscle spasms, and medication to control his bladder.   Tr. 49.   Aside from seeing his primary care physician, Plaintiff also saw a neurologist, Dr. Khalidi; however, he stated that he recently had to discontinue seeing Dr. Khalidi due to a change in his insurance.   *Id.* Plaintiff testified that when he experiences a seizure, he is unable to remember much of what happens because he blacks out; however, his wife typically is with him when he has these seizures.   *Id.*   Plaintiff further testified that he often wakes up hurt after a seizure.   As an example, on one recent occasion during a seizure, he fell while holding his cell phone in his pocket, and when he awakened he discovered a bruise on his hip where the phone had been.   *Id.*   Also during his seizures, Plaintiff stated he loses control of his bladder, but not his bowels; tongue biting, resulting in sores and blisters; and drooling from his mouth, but not amounting to frothing.   Tr. 50. Plaintiff testified that, assisted by his wife, he maintains a journal to document his seizures.   Tr. 51.   He further stated that during the month of June 2013 alone he suffered about five or six seizures, with a couple "good seizures," meaning seizures when he gets hurt.   *Id.*   The previous month, Plaintiff reported having more than eight seizures; however, he was unable to generalize the total number of seizures that he experiences in any given month.   Tr. 52.

Plaintiff stated he had been consistently taking his medication and had noticed some improvement with his seizures in that he no longer suffers from thirteen seizures per day as he had in the past.   Tr. 53.   In terms of side effects, Plaintiff

testified that he experiences dizziness, lightheadedness, and numbness of his left arm and leg.  *Id.*  Plaintiff attributed the weakness in the left side of his body as well his memory problems to his seizure condition.  Tr. 54.  He further stated that he is unable to comfortably carry heavy weight, indicating that a gallon of milk was too much for him to handle because he must use crutches to walk.  *Id.*  Plaintiff stated he must use crutches due to weakness in his left ankle, which he has broken approximately six (6) times in the past, usually caused by falling during a seizure. Tr. 54-55.  Other than the necessity of using crutches to walk, Plaintiff also testified that he has difficulty in caring for himself, requiring the assistance of his wife in performing everyday tasks such as dressing himself.  Tr. 57.  In addition to his seizures, his symptoms include depression and constant headaches.  Tr. 57-58. According to Plaintiff, he wakes up with a headache and goes to bed with a headache "pretty much constantly."  Tr. 58.  He testified that although he is able to go to AA meetings once a month and church every Sunday, overall he is unable to participate in many activities.  Tr. 59.

After reviewing the medical evidence, on August 2, 2013, the ALJ issued a decision finding that Plaintiff is not disabled and denying his claim.  Tr. 15-28.  The ALJ found that Plaintiff had the severe impairments of "[s]eizure disorder; degenerative disc disease of the lumbar and thoracic spine; cervical spondylosis; depressive disorder; mood disorder; personality disorder; headaches; and polyarthralgias."  Tr. 17.  At step three, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals

the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. . . ." *Id.*

The ALJ expressly considered whether Plaintiff met the requirements of either Listing 11.02 for convulsive epilepsy or Listing 11.03 for nonconvulsive epilepsy. Tr. 18. The ALJ noted the standard to meet Listing 11.02, "the claimant's condition must be documented by detailed descriptions of a typical seizure pattern, occurring at least once a month in spite of three months of treatment." *Id.* She further stated that under both Listing 11.02 and Listing 11.03, "the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment." *Id.* (citing Section 20 C.F.R. Part 404, subpart P, app. 1, §11.00A). The ALJ concluded that the medical evidence establishes that Plaintiff has not had seizures as frequently as required by Listings 11.02 and 11.03, noting that since Plaintiff's alleged onset date (October 2007), the record shows that Plaintiff's treatment "mainly involved medication management with few reports of seizure activity." Tr. 18.

The ALJ concluded, with his severe impairments, that Plaintiff had the residual functional capacity ("RFC") to perform light work, with the following limitations:

> [He has] the ability to frequently balance, stoop, kneel, crouch, and crawl, and frequently interact with supervisors, co-workers, and the general public. The claimant is precluded from driving and must avoid all exposure to hazards, including moving machinery and unprotected heights. The claimant is also limited to work environments in which the lighting level does not exceed that found in a typical office environment. Overall, the claimant is limited to simple and routine tasks. The claimant will also require the use of an assistive device, such

as a cane or crutches, to ambulate.

Tr. 20.   The ALJ ruled that Plaintiff's impairments and these limitations prevented Plaintiff from performing his past relevant work as a maintenance person, delivery driver and kitchen helper, finding that the mental and physical demands of Plaintiff's past relevant work exceeded his RFC.   Tr. 26.   After posing hypotheticals to the VE, the ALJ determined that considering the Plaintiff's age, education, work experience and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff could perform, such as cashier II, mail clerk or parking lot attendant. Tr. 27.   Accordingly, the ALJ ruled that Plaintiff is not disabled through the date of the decision.   Tr. 30.   The Appeals Council let stand the decision of the ALJ as the final decision of the Commissioner.   Tr. 1-6.   Plaintiff filed his Complaint for review in this Court on January 9, 2015.   Doc. 1.

## IV.   Social Security Act Eligibility and Standard of Review

A claimant is entitled to disability benefits when he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.   42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).   The Commissioner has established a five-step sequential analysis for evaluating a claim of disability.   *See* 20 C.F.R. § 404.1520. The claimant bears the burden of persuasion through step four, and, at step five, the burden shifts to the Commissioner.   *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla, *i.e.*, evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citations omitted); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (finding that "[s]ubstantial evidence is something more than a mere scintilla, but less than a preponderance") (internal citation omitted).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote*, 67 F.3d at 1560; *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings). It is the function of the Commissioner, and not the courts, to resolve conflicts in the evidence

and to assess the credibility of the witnesses.  *Lacina v. Commissioner, 2015 WL 1453364* at *2 (11th Cir. 2015), *citing Grant v. Richardson,* 445 F.2d 656 (5th Cir.1971).

## V.   Discussion

### A. Whether substantial evidence supports the ALJ's finding that Plaintiff's impairments do not meet or equal Listing 11.02.

Plaintiff's first argument on appeal concerns the ALJ's decision in step three that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listing 11.02.   Doc. 18 at 1.   The listings describe impairments that the Commissioner considers severe enough to prevent a person from doing "any gainful activity, regardless of his or her age, education, or work experience."   *See* 20 C.F.R. §§ 404.1625(a), 416.925(a).   If an adult's impairment "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. . . ."   *Bowen v. Yuckert,* 482 U.S. 137, 141 (1987), *cited in Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).   The Eleventh Circuit has described how the standard is met or equaled:

> In order to *meet* a listing, the claimant must (1) have a diagnosed condition that is included in the listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and the duration requirement. A diagnosis alone is insufficient. [] In order to *equal* a listing, the medical findings must be at least equal in severity and duration to the listed findings.

*Wilkinson on Behalf of Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987), citing 20 C.F.R. § 416.925(c)-(d).   The burden of establishing that a claimant's impairments

meet or equal a listing rests with the claimant, who must produce specific medical findings that satisfy all the criteria of a particular listing.   20 C.F.R. § 404.1520(a)(4).

The relevant listing at issue in this case is described as follows:

11.02 Epilepsy - convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With:

A.  Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.[3]

20 CFR Part 404, subpart P, app. 1, § 11.02.

In making her determination at step three, the ALJ determined that Plaintiff did not meet the frequency requirement of Listing 11.02.   Tr. 18.   She considered Plaintiff's June 12, 2013 hearing testimony that he experienced at least eight seizures the month prior to the hearing and five or six in the month of June leading up to the hearing.   *Id.*   The ALJ found that Plaintiff's testimony with respect to the frequency of his seizures was inconsistent with his reports to his treatment providers or not reflected in the medical records, noting that since Plaintiff's alleged onset date of October 2007, his treatment "mainly involved medication management with few reports of seizure activity."   *Id.*   For example, the ALJ discussed Plaintiff's visit to Kenneth Berdick, M.D., on January 24, 2011, during which Plaintiff reported he had been seizure-free for over one year up until the day before his examination.   *Id.*

---

[3] Plaintiff does not argue that his impairments met or equaled subsection B of listing 11.02.   *See* Doc. at 16.

(citing Tr. 346).   The ALJ noted that the next report of seizure activity in Plaintiff's record was not until May 2011, during a visit to Nasir Khalidi, M.D., for a neurological consultation.   Tr. 18 (citing Tr. 438).   The ALJ further noted that the only report of seizure activity made in 2012 was during emergency room treatment on August 17, 2012, which Plaintiff sought after a fall and during which he "complained of a history of seizure disorder."   Tr. 18 (citing Tr. 523). Acknowledging that Plaintiff submitted a calendar indicating dates he had seizures (Tr. 544-53), the ALJ concluded that the record contained "only minimal documented description of the claimant's seizure activity without the frequency required to meet Listing 11.02 or 11.03."   Tr. 18.

Plaintiff disputes that Dr. Berdick's records are complete or accurate, identifying a letter he wrote to the physician on April 21, 2011.   Tr. 269.   Plaintiff points to an emergency room visit in April 2010, in which he reported having had a seizure two days earlier, on April 15, 2010.   Doc. 18 at 17, Tr. 335.   Plaintiff also cites to non-medical records, including his questionnaire and letters from Dr. Devota Nowland, Plaintiff's friend, Pricilla Spear, and his pastor.   Doc. 18 at 17 (citing Tr. 236, 249, 258, 365 and 388).

With respect to the letter from Dr. Nowland and those from Plaintiff's pastor and friend, the ALJ first discussed Dr. Nowland's April 21, 2011 letter.   The ALJ determined that her opinion was not based on a traditional treatment relationship with Plaintiff but instead in heavy reliance on Plaintiff's subjective complaints and Dr. Nowland's personal relationship with the Plaintiff, which the ALJ construed as

"sympathetic rather than based on objective medical evidence." Tr. 22. Indeed, Dr. Nowland herself acknowledges this in her letter. *See* Tr. 388-89 (discussing how she came to know Plaintiff and his request for her to review his records). The ALJ also discussed the third party statements submitted on Plaintiff's behalf from Priscilla Spear, a friend of Plaintiff's, who reported that she had known him for seven years and saw him during the months she spent in Florida. Tr. 21, 236. The ALJ noted that Ms. Spear reported her observation of a decline in Plaintiff's physical condition, which included non-stop trembling and periodic grand mal seizures. *Id.* The ALJ also noted that Ms. Spear reported on other events she had not witnessed concerning Plaintiff's seizure activity. *Id.* The ALJ further discussed the April 18, 2011 letter from Plaintiff's pastor, Ivor Marchany, who reported that he had seen Plaintiff experience seizures at least four times in the prior six or seven months while in Sunday services. Tr. 21, 249. After consideration of the evidence, including Plaintiff's testimony and questionnaire (Tr. 20), the ALJ concluded:

> [T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

Tr. 21. The ALJ further discussed that Plaintiff had testified that he began having seizures in 2000 or 2001, but the evidence shows he worked earning above substantial gainful activity for each year from 2001 through 2006. *Id.* She concluded that the fact that Plaintiff's seizure impairment "did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work." *Id.* The

ALJ further noted there was no evidence to suggest worsening of the Plaintiff's symptoms in 2007 through the date of the opinion.   *Id.*

Upon review of the record, the Court finds that the ALJ applied the proper legal standard, and substantial evidence supports the ALJ's finding that Plaintiff did not meet or equal an impairment in Listing 11.02.   Plaintiff does not appear to argue that medical evidence in the record alone provides objective evidence sufficient to meet or equal Listing 11.02.   To the extent Plaintiff is challenging the ALJ's credibility finding (Doc. 18 at 19-20), the Court finds the ALJ correctly applied the proper legal standard when she decided not to credit the claimant's testimony about his pain and other subjective symptoms – specifically, the frequency of his seizures.

In this circuit, if an ALJ does not credit a claimant's testimony about pain and other subjective symptoms, he must articulate explicit and adequate reasons for doing so.   *Foote*, 67 F.3d at 1561-62; *see also Belton v. Comm'r of Soc. Sec.*, No. 608-cv-1544-Orl-KRS, 2010 WL 98988, at *11 (M.D. Fla. Jan. 6, 2010).[4]   The ALJ did so here.   As stated in SSR 96-7p:   "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific

---

[4] Plaintiff cites *Belton* for the proposition that an ALJ may make an unfavorable credibility finding as to the frequency of symptoms, such as seizures, which is supported by substantial evidence "when the only evidence about the level of seizure activity is the claimant's self report and the record establishes lack of medication compliance."   Doc. 18 at 19 (citing 2010 WL 98988, at *11-12).   The Court disagrees with this interpretation of the holding.   Although in *Belton* the ALJ did not credit the claimant's testimony concerning the frequency of his seizures because the ALJ found the claimant was not compliant with her medication, the court held that in accordance with the law of this circuit, the ALJ "articulated explicit and adequate reasons, supported by evidence in the record, for finding that Belton's testimony was not generally credible."   2010 WL 98988, at *11.   The holding in *Belton* thus also supports affirming the ALJ's decision in this case.

reasons for the weight given to the individual's statement."   Here, the ALJ articulated explicit and adequate reasons for discounting Plaintiff's self-reports and testimony, as is required in this circuit.   She based her credibility determination on the lack of medical evidence of record concerning his seizure activity, as outlined above.   Tr. 21-24.

Listing 11.02 requires a documented showing of seizures occurring more frequently than once per month with, relevant here, daytime episodes involving loss of consciousness and convulsions.   20 CFR Part 404, subpart P, app. 1, § 11.02A. Here, the ALJ rejected Plaintiff's contention that he met the frequency of the listing, noting that the "medical evidence establishes that the claimant has not had seizures as frequently as required by Listings 11.02 and 11.03."   Tr. 18.   Substantial evidence supports the ALJ's finding.   From 2005 through 2010, there were only sporadic reports of seizures in Plaintiff's medical records, none approaching the frequency required by Listing 11.02.   Plaintiff reported a "prodome to having a seizure" in 2005.   Tr. 309.   His next medical record of seizure activity is in November 2007.   Tr. 326.   After that time, the records show Plaintiff was taken to the emergency room in October 2008, but it did not appear he was taking his medication regularly at that time.   Tr. 342.   Plaintiff next reported a seizure in early July 2009, when he sought treatment in the ER for left testicular pain.   Tr. 340.   When he visited his primary care physician, Dr. Berdick, later in July, Plaintiff's wife reported her husband having "breakthrough seizures," at night, but they were not of the kind covered in Listing 12.02, as they were not tonic-clonic in

nature.   Tr. 351, see 20 C.F.R. part 404, subpart P, app. 1, § 11.02A (daytime episodes of seizures involving loss of consciousness and convulsions).   In the latter part of 2009, Plaintiff sought medical treatment but either made no mention of his seizures (Tr. 337) or reported he was not experiencing any because his medication was controlling them (Tr. 350).   Plaintiff's next report of a seizure was in mid-April, 2010, in which he visited the ER for nausea, vomiting and diarrhea.   He reported these symptoms began after his latest seizure two days earlier during which he hit his head.   Tr. 335.   He did not report another seizure until January 2011.   Tr. 346.

The ALJ discussed the documented reports of his seizure activity beginning with the July 24, 2011 report to Dr. Berdick, in which Plaintiff noted he had been seizure-free up until the day before his examination, which the record appears to support.   Tr. 18.   For example, the ALJ discussed Plaintiff's next report of seizure activity to Dr. Khalidi in May 2011 (Tr. 18) and in June 2011 (Tr. 23), but that the one in June had no tongue-biting or urinary incontinence, which would not be considered an event under Listing 11.02.   Tr. 23.   The ALJ further noted that Plaintiff reported to Dr. Khalidi in July 2011 that he had had a seizure (Tr. 430), but the record instead shows that Plaintiff reported he was dizzy when he was stooping over trying to fix a toilet and fell "but no tonic-clonic movement in the arms and/or legs was observed."   Tr. 23, 430.   While the ALJ did not specifically discuss Plaintiff's December 7, 2011 visit to Dr. Haywood with the Family Health Center of Southwest Florida during which he reported having a seizure three days earlier (Tr. 507), she did discuss Plaintiff's records with the Family Health Center, accurately

noting that the examinations there involved mostly medication management, except for a report of a seizure in August 2012 and another in April 2013.   Tr. 23-24. Together, the above-reported incidents of seizure activity do not meet the listing.

With respect to the calendar Plaintiff submitted, the ALJ found there was only "minimal documented description of the claimant's seizure activity" without the frequency required by the rules.   Tr. 18.   Plaintiff argues that his notations in his calendar for July to September 2012 and January to June 2013 – in which he reported from three to seven seizures in each of these months while on medication – are not *inconsistent* with the medical records and that some of the seizures noted in Plaintiff's calendar were reported to his medical providers.   Doc. 18 at 17.   For example, Plaintiff's August 16, 2012 seizure in which he fell (Tr. 546), he reported to Dr. Dobson on August 17, 2012.   Tr. 498.   While this may be true, it is also true that there are periods in which Plaintiff noted on his calendar that he was experiencing multiple seizures in a month in which he visited a medical provider yet failed to report the seizures.   See, *supra*, discussion pp. 20-23.   The ALJ did not find credible Plaintiff's testimony that he had seizures in the frequency claimed, and substantial evidence supports the ALJ's finding.

The Court finds the ALJ articulated explicit and adequate reasons, supported by evidence in the record, for finding Plaintiff's testimony was not generally credible. She based her credibility determination on a lack of documented seizure activity in the record based on her review of the entire record, as required.   Accordingly, based on the ALJ's credibility finding, there is insufficient evidence in the record to show

that Plaintiff's condition met or equaled Listing 11.02, and the ALJ did not err in concluding that Plaintiff did not meet the listing.

### B. *Whether substantial evidence supports the ALJ's assessment of Plaintiff's Residual Functional Capacity.*

Plaintiff next asserts that the ALJ's RFC failed to include limitations in Plaintiff's ability to sustain attention and concentration.   Doc. 18 at 21.   He argues that while the ALJ found that Plaintiff's mental impairments caused a moderate limitation in maintaining concentration, persistence or pace (Tr. 19), the ALJ included in the RFC only a limitation to simple routine tasks (Tr. 20) and "failed to analyze the medical opinions on other diverse functions."   Doc. 18 at 21-22.   The Commissioner responds that the ALJ properly considered the overall evidence when she assessed Plaintiff's RFC, which included Plaintiff's allegations of his limitations, third-party statements of Plaintiff's seizures and medical treatment, and a detailed summary of the medical and opinion evidence.   Doc. 19 at 13, *see, e.g.,* Tr. 20-26. The Commissioner notes in addition that the ALJ assessed Plaintiff's credibility with respect to his alleged limitations, as required under the Social Security regulations. Doc. 19 at 13-14.

When an impairment does not meet or equal a listed impairment at step three, as in this case, the ALJ will proceed to step four to assess and make a finding regarding the claimant's RFC based upon all the relevant medical and other evidence in the record.   20 C.F.R. § 404.1520(e).   Here, as noted, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1."   Tr. 18.   The ALJ then proceeded to assess and make a finding regarding the claimant's RFC.   The RFC is the most that a claimant can do despite his limitations.   *See* 20 C.F.R. § 404.1545(a)(1).   The ALJ is required to assess a claimant's RFC based on all of the relevant evidence in the record, including any medical history, medical signs and laboratory findings, the effects of treatment, daily activities, lay evidence and medical source statements.   *Id.*   At the hearing level, the ALJ has the responsibility of assessing a claimant's RFC.   *See* 20 C.F.R. § 404.1546(c).   The determination of RFC is within the authority of the ALJ; and the claimant's age, education and work experience are considered in determining the claimant's RFC and the claimant's ability to return to past relevant work.   *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)).   The RFC assessment is based upon all the relevant evidence of a claimant's remaining ability to do work despite impairments.   *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440 (citing 20 C.F.R. § 404.1545(a)).

In this case, the ALJ determined at step two that Plaintiff's mental impairments caused a moderate limitation in maintaining concentration, persistence, and pace.   Tr. 19.   Later, the ALJ found that Plaintiff has the RFC to perform light work,[5] with additional restrictions.   Tr. 18-26.   With respect to Plaintiff's mental

---

[5] The regulations define "light work" as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.   Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.   To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.   If someone can do light work, we determine that he or she can also do sedentary work, unless there

limitations, the ALJ restricted his RFC to simple and routine tasks.   Tr. 20, 25.
Plaintiff contends that the ALJ only generically referred to the medical opinions
concerning his mental limitations, giving each of them "some weight," and reached
her RFC finding "without any explanation for the opinions on specific areas of
functioning."   Doc. 18 at 22 (citing Tr. 26).   For example, the Plaintiff notes that the
ALJ gave some weight to the opinion of consultative examiner J. L. Bernard, Ph.D.,
and some weight to the state agency psychological consultants, Thomas Conger,
Ph.D., and Dr. Suansillppongse, reasoning their opinions were consistent with Dr.
Bernard's report, but argues the state agency consultants rendered "different
opinions so it is unclear which portions of their opinions the ALJ perceived as
consistent with Dr. Bernard's report and which she perceived as inconsistent."   Doc.
18 at 22.

In the Eleventh Circuit, the law is clear that "the ALJ must state with
particularity the weight given to different medical opinions and the reasons therefor."
*Winschel v. Comm'r of Soc. Sec.*, 630 F.3d 1176, 1179 (11th Cir. 2011) (citing *Sharfarz
v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)) (per curiam).   The court reiterated in
*Winschel*, "[i]n the absence of such a statement, it is impossible for a reviewing court
to determine whether the ultimate decision on the merits of the claim is rational and
supported by substantial evidence."   630 F.3d at 1179 (citing *Cowart v. Schweiker*,
662 F.2d 731, 735 (11th Cir. 1981)).   An ALJ who fails to "state with at least some

---

are additional limiting factors such as loss of fine dexterity or inability to sit for long
periods of time.

20 C.F.R. § 404.1567(b).

measure of clarity the grounds for his decision" cannot be affirmed because the court cannot perform its duty to "scrutinize the record as a whole to determine whether the conclusions reached are rational."   630 F.3d at 1179 (citations omitted).

With respect to Plaintiff's psychological impairments, the ALJ observed that, similar to Plaintiff's physical impairments, there likewise is limited evidence concerning Plaintiff's psychological impairments.   She stated that "[t]he record reflects no actual treatment for his depression," noting the "only [such] treatment in the record is from a one-time evaluation with Ms. Elder a licensed clinical social worker."   Tr. 25, 370-87.   She further observed there is no record that Plaintiff was prescribed medication for his psychological condition or any follow-up treatment of any significance.   Tr. 25.   Nor, she noted, did Plaintiff complain of psychological symptoms to his primary care physicians.   *Id.*   In evaluating Plaintiff's concentration, persistence or pace at step three, the ALJ stated that Plaintiff reported on a "good day he can pay attention for a couple of hours but on a bad day he has trouble concentrating for more than 5 or 10 minutes."   Tr. 19 (citing Tr. 265).   The ALJ noted also that Plaintiff testified that he has difficulty with his memory, attributing this problem to his seizure disorder.   Tr. 19.   She then noted Dr. Bernard reported Plaintiff's concentration was "intact for brief tasks . . . [and] that the claimant was able to retain, execute, and sequence a multilayered task."   Tr. 19, 419.   The ALJ opined that "[g]iven this balance of evidence and giving the greatest benefit to the claimant, the evidence supports a finding of moderate limitations present" at step two.   Tr. 19.

The ALJ thus concluded the evidence supports an RFC for light work activities, with additional postural and environmental limitations to accommodate Plaintiff's seizure disorder and degenerative disc disease.   She further limited Plaintiff to simple and routine tasks.   *Id.*   With respect to Plaintiff's mental limitations and how they affect his ability to work, the ALJ discussed the examination with Mary Ann Elder, LCSW, dated March 8, 2011, to whom Plaintiff was referred by his friend, Pricilla Spear.   Tr. 24, 372.   The ALJ noted that Plaintiff told Ms. Elder that he was depressed about his medical, financial and family situation; with respect to his medical history, "he reported that he was told he would be dead in a year."   Tr. 24 (citing Tr. 372).   Ms. Elder assessed Plaintiff with "polysubstance dependence in full sustained remission, depression disorder, impulse control disorder as well as rule out assessments of major depressive disorder and post-traumatic stress disorder with a GAF of 52."   Tr. 24, 375.

The ALJ next discussed the May 18, 2011 consultative examination of Dr. Bernard, to whom plaintiff reported "worsening depression, anxiety, obsessive thinking, suicidal behavior and inability to focus his attention."   Tr. 24, 416.   She gave his opinion "some weight," finding that the results of his psychological examination support the RFC and are "consistent with the record as a whole.   Tr. 26, 415-20.   With respect to Plaintiff's concentration, the ALJ noted: "More specifically, the claimant indicated that he has problems recalling things that happened as recently as 20 minutes ago."   *Id.*   Dr. Bernard described Plaintiff's brief recall as "somewhat impaired" but that Plaintiff's attention to brief task was intact.

Tr. 419.   The ALJ stated that Dr. Bernard reported overall that "despite the claimant's reasonably good scores on the screening devices, he appears to be having difficulty with cognitive functioning."   Tr. 24, 419.   Dr. Bernard assessed Plaintiff with "major depressive disorder, severe, without psychosis; post-traumatic stress disorder; polysubstance abuse in sustained full remission; and dementia secondary to multiple medical conditions, head injury and seizure related condition with a current GAF of 41 and a high the prior year of 75."   *Id.*   Ultimately, the ALJ gave Dr. Bernard's opinion "some weight," finding that the results of his psychological examination support the RFC and are "consistent with the record as a whole."   Tr. 26, 415-20.   With respect to the consultative examinations of the State agency psychologists, the ALJ further concluded:

> Additionally, the opinions of the State agency psychological consultants' assessments are given some weight as they are consistent with Dr. Bernard's examination reporting some limitations in the work setting (Exs. 1A/2A, 5A/6A, 18F, and 19F).

Tr. 26.

Although the ALJ did not fully discuss the opinions of Dr. Conger and Dr. Suansillppongse, she accorded them some weight because she found their opinions to be consistent with that of Dr. Bernard's.   Tr. 26.   The Court finds no error here, and agrees that both opinions of the State agency psychologists are consistent with Dr. Bernard's opinion with respect to the issue here – Plaintiff's concentration, persistence and pace. Dr. Conger found that Plaintiff had the mental ability to perform routine activities; and, similar to Dr. Bernard, he assessed Plaintiff's difficulty in maintaining concentration, persistence or pace as moderate.   Tr. 79.   He further found Plaintiff's allegations

concerning his severe memory problems as not fully credible, because they were inconsistent with the results of Plaintiff's recent Mental CE and "not supported by the results of more objective evidence." Tr. 79, 81.   Dr. Conger concluded that although Plaintiff "may experience some memory problems at times, he remains functional from a mental perspective."   Tr. 79.

Similarly, Dr. Suansillppongse found that Plaintiff had a moderate degree of limitation in maintaining concentration, persistence or pace, noting that the majority of medical evidence was related to Plaintiff's physical impairments.   Tr. 465, 467. He further found that Plaintiff's mental condition is "self-limiting or improved with appropriate treatment and sobriety," and, based on his MMSE score of 29 out of 30, found no evidence of significant thought disorder or cognitive deficits.   Tr. 467.   Dr. Suansillppongse found that Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace was moderately limited.   Tr. 470.   Ultimately, he opined that Plaintiff would be able to complete on-the-job tasks at an acceptable pace. Tr. 470.

The Court finds no inconsistencies in the opinions of the State psychologists compared to that of Dr. Bernard, as found by the ALJ, and that the ALJ stated with sufficient particularity the weight she gave to their opinions and the reasons for them, in accordance with the law of this circuit.   As noted by the Eleventh Circuit, "[t]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision" as long as there is enough information to enable the court to conclude

that the ALJ considered the medical evidence as a whole.  *Dyer*, 395 F.3d at 1211. The Court finds the ALJ did so here, and thus substantial evidence supports the RFC finding of the ALJ with respect to Plaintiff's ability to sustain attention and concentration.

Plaintiff finally argues, briefly, that the evidence further establishes that Plaintiff has an additional limitation in his ability to stand, citing to Dr. Khalidi's examinations that revealed neurological deficits.   Doc. 18 at 24, Tr. 432, 437, 440. The Commissioner responds, correctly, that the ALJ considered Dr. Khalidi's examination results (Doc. 19 at 18), and ultimately decided "despite the lack of evidence" to support a limitation and make accommodation for the use of an assistive device.   Tr. 25.   The Court finds no error in this aspect of the ALJ's decision, as it is supported by substantial evidence.

## VI.   Conclusion

Upon review of the record, the undersigned concludes that the ALJ applied the proper legal standards, and her determination that Plaintiff is not disabled is supported by substantial evidence.

ACCORDINGLY, it is hereby

**ORDERED:**

1.      The decision of the Commissioner is **AFFIRMED**.

2.      The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) in favor of the Commissioner, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida on this 10th day of March, 2016.


CAROL MIRANDO
United States Magistrate Judge


Copies:
Counsel of record